1   NIALL P. McCARTHY (SBN 160175)
    nmccarthy@cpmlegal.com
2   JUSTIN T. BERGER (SBN 250346)
    jberger@cpmlegal.com
3   SARVENAZ "NAZY" J. FAHIMI (SBN 226148)
    sfahimi@cpmlegal.com
4   **COTCHETT, PITRE & McCARTHY, LLP**
    San Francisco Airport Office Center
5   840 Malcolm Road
    Burlingame, CA 94010
6   Telephone: (650) 697-6000
    Facsimile: (650) 697-0577
7
    *Attorneys for Relator*
8

**FILED**

**JUL 15 2021**

SUSAN Y. SOONG
CLERK, U.S. DISTRICT COURT
NORTH DISTRICT OF CALIFORNIA

**UNITED STATES DISTRICT COURT**

**NORTHERN DISTRICT OF CALIFORNIA**

`DMR`

| | |
|---|---|
| [UNDER SEAL], | CASE NO. **CV 21 - 5444** |
|     Plaintiffs, | **COMPLAINT FOR DAMAGES** |
|     v. | **1. PRESENTING FALSE CLAIMS, (31 U.S.C. § 3729(a)(1)(A))** |
| [UNDER SEAL], | **2. MAKING OR USING FALSE RECORDS OR STATEMENTS MATERIAL TO PAYMENT OR APPROVAL OF FALSE CLAIMS (31 U.S.C. § 3729(a)(1)(B))** |
|     Defendant. | **3. CONSPIRACY (31 U.S.C. § 3729(a)(1)(C))** |
| | **4. REVERSE FALSE CLAIMS (31 U.S.C. § 3729(a)(1)(G))** |
| | <u>**DEMAND FOR JURY TRIAL**</u> |

**[FILED IN CAMERA AND UNDER SEAL PURSUANT TO 31 U.S.C. § 3730(b)(2)]**

1  NIALL P. McCARTHY (SBN 160175)
   nmccarthy@cpmlegal.com
2  JUSTIN T. BERGER (SBN 250346)
   jberger@cpmlegal.com
3  SARVENAZ "NAZY" J. FAHIMI (SBN 226148)
   sfahimi@cpmlegal.com
4  **COTCHETT, PITRE & McCARTHY, LLP**
   San Francisco Airport Office Center
5  840 Malcolm Road
   Burlingame, CA 94010
6  Telephone: (650) 697-6000
   Facsimile: (650) 697-0577
7
   *Attorneys for Relator*
8

9                 **UNITED STATES DISTRICT COURT**

10                **NORTHERN DISTRICT OF CALIFORNIA**

| | |
|---|---|
| UNITED STATES OF AMERICA *ex rel.* INTREPID5 LLC | CASE NO. |
| Plaintiffs, | **COMPLAINT FOR DAMAGES** |
| v. | 1. **PRESENTING FALSE CLAIMS, (31 U.S.C. § 3729(a)(1)(A))** |
| UNITEDHEALTH GROUP, INC., a Delaware corporation; UNITED HEALTHCARE SERVICES, INC., a Minnesota corporation; UNITEDHEALTHCARE, INC., a Delaware corporation; UNITEDHEALTHCARE INSURANCE COMPANY, a Connecticut corporation; UHIC HOLDINGS, INC., a Delaware corporation; OPTUM, INC. & OPTUMINSIGHT, INC., Delaware corporations; and SEMLER SCIENTIFIC, INC., a Delaware corporation, | 2. **MAKING OR USING FALSE RECORDS OR STATEMENTS MATERIAL TO PAYMENT OR APPROVAL OF FALSE CLAIMS (31 U.S.C. § 3729(a)(1)(B))** |
| | 3. **CONSPIRACY (31 U.S.C. § 3729(a)(1)(C))** |
| | 4. **REVERSE FALSE CLAIMS (31 U.S.C. 3729(a)(1)(G))** |
| Defendant. | |
| | **DEMAND FOR JURY TRIAL** |

                 [FILED IN CAMERA AND UNDER SEAL
                 PURSUANT TO 31 U.S.C. § 3730(b)(2)]

# TABLE OF CONTENTS

Page No.

I.     INTRODUCTION ............................................................................................ 1

II.    JURISDICTION AND VENUE ...................................................................... 4

III.   PARTIES ......................................................................................................... 4

    A.   Relator .................................................................................................. 4

    B.   Defendants ........................................................................................... 4

IV.    OVERVIEW OF THE SCHEME .................................................................... 6

    A.   The United States Medicare System .................................................... 6

    B.   The Medicare Advantage Program (Medicare Part C) ........................ 7

        1.   Medicare Advantage Coverage and Risk Adjustment Payments ......... 7

        2.   Medicare Advantage Plans are Subject to the Same Laws and Regulations as Traditional Medicare ................................................. 8

    C.   Peripheral Artery Disease and Related Medicare Guidelines ............ 10

    D.   Volume Plethysmography ABI vs. Photo Plethysmography ............. 10

    E.   Defendants Engaged in a Scheme to Increase the Percentage of MA Patients Diagnosed with PAD ........................................................... 12

        1.   United concluded that MA pays significantly more for patients diagnosed with PAD—a lifelong condition ...................................... 12

        2.   The QuantaFlo machine provided the perfect opportunity for United to capitalize on the PAD diagnosis premium .................................... 14

            a.   Pre-2015, Semler's device was approved by the FDA only for extremity pulse detection, not PAD diagnosis ......................... 14

            b.   Semler re-branded its device as "QuantaFlo," and fraudulently obtained FDA approval for use in diagnosis of PAD. ............. 15

            c.   United contracted with Semler to use Semler's sham PAD screening test, and gave providers the machines to use on MA patients. .................................................................................. 17

            d.   The sham screening test results in 30% of patients being diagnosed with PAD, where in reality only 9-14% have PAD ............ 18

            e.   QuantaFlo is unreliable technology. ......................................... 20

    F.   Defendants submitted False Claims ................................................... 20

LAW OFFICES
COTCHETT, PITRE &
McCARTHY, LLP

V.    CAUSES OF ACTION..................................................................................................22

FIRST CAUSE OF ACTION
ON BEHALF OF THE UNITED STATES
VIOLATIONS OF THE FEDERAL FALSE CLAIMS ACT
PRESENTING FALSE CLAIMS
AGAINST ALL DEFENDANTS
(31 U.S.C. § 3729(a)(1)(A)) ..........................................................................................22

SECOND CAUSE OF ACTION
ON BEHALF OF THE UNITED STATES
VIOLATIONS OF THE FEDERAL FALSE CLAIMS ACT
MAKING OR USING FALSE RECORDS OR STATEMENTS MATERIAL TO PAYMENT
OR APPROVAL OF FALSE CLAIMS,
AGAINST ALL DEFENDANTS
(31 U.S.C. § 3729(a)(1)(B)) ..........................................................................................23

THIRD CAUSE OF ACTION
ON BEHALF OF THE UNITED STATES
VIOLATIONS OF THE FEDERAL FALSE CLAIMS ACT
CONSPIRACY,
AGAINST ALL DEFENDANTS.
(31 U.S.C. § 3729(a)(1)(C)) ..........................................................................................23

FOURTH CAUSE OF ACTION
ON BEHALF OF THE UNITED STATES
VIOLATIONS OF THE FEDERAL FALSE CLAIMS ACT
REVERSE FALSE CLAIMS,
AGAINST ALL DEFENDANTS
(31 U.S.C. 3729(a)(1)(G)) ............................................................................................24

VI.    PRAYER FOR RELIEF ............................................................................................25

VII.    JURY DEMAND......................................................................................................25

1    Plaintiff UNITED STATES OF AMERICA ("United States"), by and through Relator

2    INTREPID5 LLC allege as follows:

3    **I.     INTRODUCTION**

4         1.     Relator brings this *qui tam* action on behalf of the United States to recover losses

5    sustained by the Medicare program as a result of a massive overbilling scheme revolving around false

6    and inaccurate diagnostic tests.  This scheme was carried out by Defendants UnitedHealth Group,

7    Inc., United Healthcare, Inc., United Healthcare Insurance Company, Inc., United Healthcare

8    Services, Inc., UHIC Holdings, Inc., Optum, Inc. (collectively "United"), and Defendant Semler

9    Scientific, Inc. ("Semler").

10        2.     The Medicare Advantage Program ("MA Program") provides Medicare benefits

11   through private insurers.  These plans are held to the same coverage conditions and restraints as

12   standard Medicare fee-for-service.  Medicare beneficiaries enroll in managed healthcare insurance

13   plans called Medicare Advantage Plans ("MA Plans") that are owned and operated by private

14   insurance organizations.  United is the largest owner of Medicare Advantage organizations ("MA

15   organizations").  This $235 billion public company has a 26% Medicare Advantage (MA) market

16   share through its Optum Division.  The government pays each MA organization a fixed monthly

17   payment for each beneficiary enrolled in the plans.  The government adjusts the payments based on

18   several risk factors, including the health condition of each enrollee.  The adjustment, often referred to

19   as a Risk Adjustment Factor ("RAF"), is used to ensure that MA organizations are paid more for

20   enrollees expected to incur higher healthcare costs and less for healthier enrollees expected to incur

21   lower costs.

22        3.     Unfortunately, this payment model also creates an incentive for unscrupulous MA

23   organizations to over-report diagnosis codes with higher RAF scores in order to increase the

24   reimbursement.  To protect the Government from improper payments stemming from inflated RAF

25   scores, the MA Program requires that diagnoses be heavily supported in the beneficiaries' medical

26   records.  Further, MA organizations are required to institute and maintain compliance programs to

27   prevent fraud.

28

4.     Despite these safeguards, in order to increase Medicare Advantage reimbursement, from at least 2015 to 2021, Defendants engaged in a scheme to increase the number of MA Plan beneficiaries diagnosed with Peripheral Arterial Disease ("PAD"), a condition that significantly increases RAF scores—and reimbursement. Defendants carried out this scheme by pressuring and incentivizing physicians to systematically screen for PAD using an inaccurate and unproven technology: Defendant Semler's device, QuantaFlo.

5.     Worse still, Semler obtained FDA approval of its QuantaFlo device through pure deception. In its 510(k) application for approval from the FDA, Semler described the QuantaFlo device as a "volume" plethysmograph. This was false. The QuantaFlo device is not a "volume" plethysmograph, it is a "photoelectric" plethysmograph (also sometimes referred to, in short, as a "photo" plethysmograph). The difference is critical. Photoelectric plethysmography is widely considered so inaccurate and experimental that it is not approved for reimbursement by Medicare or any other major insurer. Photoelectric plethysmography is useful only for detecting a pulse; nothing more. And it is certainly not indicated for diagnosing serious diseases such as PAD. Knowing this, Semler committed a fraud on the FDA by falsely describing QuantaFlo as a volume plethysmograph, and thereby obtained approval for the device to be used for diagnosis of PAD.

6.     With FDA approval in-hand, Semler's business model became simple: It marketed its QuantaFlo device to MA organizations such as United as a money-maker. With a simple five-minute test using the QuantaFlo device, Semler asserted, massive swaths of Medicare beneficiaries will be diagnosed with PAD, increasing reimbursement rates from CMS to Medicare Advantage plans by some *$3,000* per patient.[1] Moreover, the increase is not temporary, but lasts for the life of the beneficiary.

7.     This opportunity for easy profits proved too good for United to pass up. Though its own policy considered the QuantaFlo technology inadequate for PAD diagnosis, United was quick to jettison its policy when faced with the opportunity to massively increase its revenues from Medicare. Accordingly, United entered into an agreement with Semler to purchase or lease hundreds of

---

[1] This estimate is based on Hierarchical Condition Category ("HCC") codes, which dictate the RAF score for specific conditions, including PAD.

LAW OFFICES
CUTCHETT, PITRE &
McCARTHY, LLP

1    QuantaFlo machines, which it then forced upon its employees and in-network providers.  United

2    incentivized physicians to use QuantaFlo as a screening device by reimbursing them for each

3    QuantaFlo test.  To further ensure that physicians were screening sufficient numbers of patients,

4    Semler provided reports to United about which providers were using the machines and the volume of

5    tests ordered by provider.

6        8.    This scheme led to a huge increase in PAD diagnoses (CPT 93922), and a whopping

7    30% increase in Medicare payments to United for each patient diagnosed with PAD.  Given United's

8    dominance of the MA market, this fraud is likely to have resulted in hundreds of millions in

9    overpayments to United over the last several years.  For example, in 2018 alone, United had

10   approximately 5 million members, nationwide.  Even if only 1% of those members were diagnosed at

11   some point with PAD using QuantaFlo, that would result in $153 million in excess Risk Adjustment

12   payments to United for 2018 alone.  The true damages to taxpayers are likely much higher, as

13   QuantaFlo causes vast overdiagnosis of PAD, and once diagnosed, increase payments continue into

14   perpetuity.

15       9.    Unfortunately for taxpayers, the QuantaFlo test is a sham.  Defendants marketed

16   QuantaFlo as a device capable of measuring the Ankle-Brachial Index ("ABI") via volume

17   plethysmography, a valid criteria for purposes of diagnosing PAD.  However, as mentioned above,

18   QuantaFlo does not in fact provide legitimate ABI readings.  As Defendants were well aware, the

19   device only has the capability of providing pulse readings, and specifically should not be used for

20   diagnostic purposes.  A National Coverage Determination ("NCD") issued by CMS, as well as

21   Noridian, the Medicare Administrative Contractor ("MAC") for Alaska, Arizona, California, Hawaii,

22   Idaho, Montana, Nevada, North Dakota, Oregon, South Dakota, Utah, Washington, and Wyoming,

23   clearly establish that the type of technology upon which QuantaFlo is built is "experimental," and not

24   to be used with Medicare beneficiaries.  Even Defendant United's own reimbursement policy states

25   that the QuantaFlo technology is considered "useful only in determining whether or not a pulse is

26   present and does not provide reproducible measurements of blood flow."  (*See* Exhibits 1 & 2).

27       10.   Due to the poor quality of the QuantFlo machine, Semler has made no significant

28   inroads into the traditional market for PAD diagnostic equipment.  Through the United scheme,

1  however, Semler's revenues have expanded at a rapid clip: They grew 72% in 2018, resulting in a

2  23% net profit; revenues grew another 52% in 2019, with a 46% net profit; and grew 18% in 2020

3  with a 36% net profit. This growth was only made possible through the United PAD scheme.

4      11.    In the form of false diagnoses, unnecessary and invalid screening tests, experimental

5  services, inflated RAF scores, and kickback-tainted services, Defendants have committed

6  thousands—likely hundreds of thousands—of violations of the False Claims Act.

7  **II.    JURISDICTION AND VENUE**

8      12.    This Court has jurisdiction over the claims raised in this Complaint under 31 U.S.C. §

9  3730(b) and 3732(a) which confer jurisdiction on this Court for actions brought under the federal

10  False Claims Act and authorize nationwide service of process.

11      13.    Venue is proper and this Court has personal jurisdiction over Defendants pursuant to

12  31 U.S.C. § 3732(a) because at least one of the Defendants can be found in, resides in, transacts

13  business in, or has committed the alleged fraudulent conduct in this District.

14  **III.    PARTIES**

15      **A.    Relator**

16      14.    Plaintiff in this action is the United States of America, by and through Relator

17  Intrepid5 LLC. Relator's members have provided the information on which these allegations are

18  based to the government prior to the filing of this action.

19      **B.    Defendants**

20      15.    Defendant UNITEDHEALTH GROUP, INC. ("UHG") is a publicly traded Delaware

21  corporation headquartered in Minnetonka, Minnesota. It offers health care products and insurance

22  services. It is the largest healthcare company in the world by revenue, with 2020 revenue of $263

23  billion and 115 million customers. It is the parent company for the other United Defendants named

24  in this Complaint. UHG, the other United Defendants, and their affiliates have offices across the

25  United States, including in this District. UHG's healthcare insurance products including under

26  Medicare Part C are offered and managed by entities that are subsidiaries of UHG, including the

27  other United Defendants named herein. UHG controls all of the other United Defendants. UHG and

28  its subsidiaries and related entities operate MA Plans in all fifty states.

16.    The number of individuals enrolled in MA Plans in 2020 was 24.1 million. Defendant United had by far the largest market share of MA Plans in 2020 reported as holding 26% of the entire market.

17.    Defendants UNITEDHEALTHCARE INSURANCE COMPANY, UNITEDHEALTHCARE, INC., UNITED HEALTHCARE SERVICES, INC., UHIC HOLDINGS, INC., and OPTUM, INC. are all affiliates or related entities of UHG.

18.    Defendant UNITEDHEALTHCARE INSURANCE COMPANY is a Connecticut corporation, a direct subsidiary of Defendant UHIC HOLDINGS, INC., and an indirect subsidiary of Defendant UHG.

19.    Defendant UHIC Holdings, Inc. is a Delaware corporation, a direct subsidiary of Defendant UNITED HEALTHCARE SERVICES, INC., and an indirect subsidiary of Defendant UHG.

20.    Defendant UNITED HEALTHCARE SERVICES, INC. is a Minnesota corporation and a direct or indirect subsidiary of Defendant UHG.

21.    Defendant OPTUM, INC. is a Delaware corporation. Optum is a direct or indirect subsidiary of Defendant UHG. OPTUM is responsible for the submission of risk adjustment data to Medicare. OPTUM revenues in 2020 were $136 billion. Optum works with about 300 health plans, including the insurance arm of UnitedHealth Group, UnitedHealthcare.

22.    Defendant SEMLER SCIENTIFIC, INC. is a Delaware corporation headquartered in Santa Clara, California. It develops, manufactures, and markets products and services for healthcare insurers and physician groups in evaluating and treating chronic diseases. SEMLER SCIENTIFIC INC.'s website describes "an emerging medical risk-assessment company whose diagnostic and testing products and services help to guide patient care and close the gap between cost of care and compensation for care." Defendant SEMLER SCIENTIFIC, INC. markets and manufactures QuantaFlo. QuantaFlo is an approximately four to five minute in-office blood flow test which uses optical sensor photoelectric plethysmography. SEMLER SCIENTIFIC, INC. advertises QuantaFlo as a "Peripheral Artery Disease Test."

## IV.    OVERVIEW OF THE SCHEME

### A.    The United States Medicare System

23.    Medicare is a federally-funded health care program that provides medical insurance coverage to qualified residents of the United States who are aged 65 and older, younger people with permanent or congenital disabilities, or those who meet other special criteria. The vast majority of Medicare's costs are paid by United States citizens through their taxes.

24.    Title XVII of the Social Security Act establishes the Medicare Program (technically, the "Health Insurance for the Aged and Disabled Program"). *See* 42 U.S.C. §§ 1397 et seq.

25.    The United States provides reimbursement for Medicare claims from the Medicare Trust Funds through the Centers for Medicare & Medicaid Services ("CMS"), which is the operating division of the United States Department of Health & Human Services ("HHS"). CMS, in turn, contracts out to Medicare Administrative Contractors ("MACs") to review, approve, and pay Medicare claims received from health care providers such as pain management clinics.

26.    Payments are typically made directly to health care providers rather than the patient, as Medicare recipients routinely assign their right to payment to the health care provider. Once a Medicare recipient assigns their right to payment to a provider, the provider then submits its bill directly to Medicare for payment.

27.    To bill Medicare, a provider must certify that the treatment was "medically indicated and necessary" for the health of the patient. Insurers, including payor Medicare, reimburse claims through Current Procedural Terminology Codes (CPT Codes). Services often include a technical component as well as a professional component (usually the physician's service).

28.    The form requires the provider to state, among other things, the procedure(s) for which it is billing Medicare, the provider number, the identity of the patient, and a short narrative explaining the diagnosis and the medical necessity of services that the provider rendered.

29.    All healthcare providers must comply with all applicable statutes, regulations, and guidelines in order to be reimbursed by Medicare. Providers have a duty to have knowledge of the relevant statutes, regulations, and guidelines regarding coverage for Medicare services. For example, Medicare reimburses only reasonable and necessary medical services furnished to beneficiaries and

1    excludes from payment services that are not reasonable and necessary. *See* 42 U.S.C. §

2    1395y(a)(1)(A); *see also* 42 C.F.R. § 411.115(k). Providers must also assure that they provide

3    medical services to Medicare recipients "economically and only when, and to the extent, medically

4    necessary." 42 U.S.C. § 1320c-5(a)(1).

**B.    The Medicare Advantage Program (Medicare Part C)**

**1.    Medicare Advantage Coverage and Risk Adjustment Payments**

7    30.    Under Medicare Parts A and B, CMS reimburses healthcare providers using a fee-for-

8    service payment system. Under this system, healthcare providers submit claims to CMS for

9    reimbursement for each service, such as a physician office visit or hospital stay. As described above,

10   CMS pays the providers directly.

11   31.    Medicare Part C is referred to as the Medicare Advantage Program. The conduct

12   described in this Complaint relates to this Program. The MA Program gives beneficiaries the option

13   to opt out of the traditional Programs A and B and enroll instead in the MA Plans. The MA Plans

14   must provide Medicare beneficiaries all the services that they are entitled to receive from the

15   traditional Medicare Program. These beneficiaries can obtain prescription coverage under Medicare

16   Part D similar to all other Medicare beneficiaries.

17   32.    Under Part C, the Medicare Program pays each MA organization a predetermined

18   monthly amount for each beneficiary in the plan. This monthly payment is known as a per-member,

19   per-month payment. This capitated payment for each plan varies depending on various factors,

20   including amounts set forth in the plan's bid submitted to CMS. First, a "base rate" is determined by

21   considering "benchmarks," which are based on county practice patterns of physicians and other

22   providers who bill Medicare for Part A and Part B services. With benchmarks determined, the next

23   step in the payment process is the submission of plan bids. Medicare Advantage plans submit bids

24   reflecting the plan's estimated cost of providing all Medicare Part A and Part B services to a

25   beneficiary with "average" health, with the exception of hospice. Bids include the estimated costs of

26   medical services as well as administrative expenses and profit. The base rate is determined by

27   comparing the plan's bid and the benchmark. If the plan's bid is below the benchmark, the bid

28   becomes the plan's base rate. If the plan's bid is at or above the benchmark, then the benchmark

1  becomes the plan's base rate, and the difference is returned to enrollees in the form of reduced cost

2  sharing obligations or enhanced benefits.

3      33.    Since 2000, Congress has required that the payments to Medicare Advantage plans be

4  risk adjusted after the base rate is calculated for each beneficiary based on demographic factors (such

5  as gender and age) and health status.  The risk adjusting for health status results in higher

6  reimbursement for beneficiaries with higher risk scores.

7      34.    CMS uses a health-based risk adjustment model referred to as the Hierarchical

8  Conditions Category ("HCC") model.  The model assigns a risk score, also called the Risk

9  Adjustment Factor (RAF) score, to each eligible beneficiary.  The model is prospective, meaning it

10  relies upon diagnoses for certain conditions assigned to beneficiaries in one year to set the payment

11  for those beneficiaries the following year.  The HCC system groups traditional diagnoses codes (ICD-

12  9 and ICD-10 codes) first into approximately 1,391 diagnostic groups, or DXGs.  Those DXGs are

13  then aggregated into approximately 204 "Condition Categories," or CCs.  Related CCs are further

14  organized by severity of diagnosis.  For example, there are four CCs related to coronary artery

15  disease, with the least severe being Coronary Atherosclerosis, and the most severe Acute Myocardial.

16      35.    CMS requires that a qualified healthcare provider (i.e. a physician or other qualified

17  clinician) assess Medicare Advantage patients at least once per year to identify all of the patient's

18  conditions that may fall within an HCC.  Documentation in the medical record must support the

19  presence of the condition and indicate the provider's assessment and plan for management of the

20  condition.

21      36.    MA organizations obtain diagnosis data from the providers that treat the beneficiaries

22  and submit the risk adjustment data, including the diagnoses, to CMS.  The RAF score dictates how

23  much CMS will reimburse the MA organization for each beneficiary enrolled.

24          **2.**    **Medicare Advantage Plans are Subject to the Same Laws and Regulations**

25            **as Traditional Medicare**

26      37.    Medicare beneficiaries who enroll in an MA Plan are considered a member of and

27  enrollee in that plan.  MA plans are held to the same coverage conditions and restraints as standard

28  Medicare fee-for-service.  *See, e.g.,* 42 C.F.R. § 422.310, subsection (d)(1).  Each year the MA

1  organizations agree in writing to comply with the applicable regulations set forth by CMS. *See* 42

2  C.F.R. §§ 422.503, 422.504, 422.505. CMS regulations applicable to MA Plans further require the

3  following: diagnosis codes which are based on face to face encounters with the provider; encounters

4  that occur during the relevant year; proper documentation of the diagnosis codes; the codes be based

5  on documented conditions that require or affect patient care, treatment or management; information

6  that is accurate, complete, and truthful; and that the MA organizations implement an effective

7  compliance program. *See* 42 C.F.R. §§ 422.503, 422.504; *see also CMS, Medicare Managed Care*

8  *Manual*, Chapter 7, § 111.8 (Rev. 57, Aug. 13, 2004).

9       38.       42 C.F.R. Section 422.310 is applicable to MA organizations submitting risk

10  adjustment data. This regulation mandates that MA organizations obtain the risk adjustment data

11  directly from the "provider, supplier, physician, or other practitioner that furnished the item or

12  service." *Id.* Further, Section 422.310, subsection (d)(1) provides: "MA organizations *must submit*

13  *data that conform to CMS's requirements for data equivalent to Medicare fee-for-service data, when*

14  *appropriate, and to all relevant national standards.* CMS may specify abbreviated formats for data

15  submission required of MA organizations." (emphasis added)

16       39.       Risk adjustment claims are true, meaning with valid RAF scores, only to the extent

17  that the diagnosis codes submitted by the MA Organizations are accurate. The diagnoses must be

18  coded according to the International Classification of Diseases (ICD) Clinical Modification

19  Guidelines for Coding and Reporting (ICD-9-CM categories, and ICD-10-CM for hospital), and

20  documented with specificity. Risk adjustment claims and payments cannot be based on questionable

21  and unacceptable diagnoses. *See RA Participation Guide* § 7.2.4.1 (2008); *see also* ICD-10-CM

22  Official Guidelines for Coding and Reporting FY 2014 (the "2014 ICD-10 Coding Guidelines") at 1

23  ("accurate coding cannot be achieved" in the absence of "complete documentation in the medical

24  record."). MA Organizations "must request payment under the contract on a document that certifies

25  (based on best knowledge, information, and belief) the accuracy, completeness, and truthfulness of

26  relevant data that CMS requests. Such data include specified enrollment information, encounter data,

27  and other information that CMS may specify." 42 C.F.R. § 422.504(l) (entitled "Certification of Data

28  that Determine Payment").

40.     Medicare benefits, and thus, MA benefits, are limited to patients with "signs or symptoms" of disease, unless otherwise statutorily provided by Congress.  Therefore, Medicare cannot cover screening procedures unless specifically covered by statue.  Some statutorily covered procedures include a screening mammogram, colonoscopy, PSA for men, to name a few.  Outside of these routine screenings mandated by Congress, coverage is limited to services and testing for where a "symptom"—what a patient indicates he/she is experiencing exists or a "sign"—a clinical finding by a clinician is made.  *See* Medicare Local Coverage Determinations (LCDs) L34219, 24339.

**C.     Peripheral Artery Disease and Related Medicare Guidelines**

41.     Peripheral artery disease, also called peripheral arterial disease, ("PAD") is a common circulatory problem, particularly in an aging patient population, in which narrowed arteries reduce blood flow to the limbs.  Many people with PAD have mild or no symptoms while some people have leg pain when walking (claudication).

42.     PAD is estimated to affect approximately 9-14% of the Medicare-aged population.  *See* https://www.ahajournals.org/doi/full/10.1161/JAHA.116.003796, Journal of the American Heart Association article.

43.     The coding guidelines applicable to Medicare reimbursement require use of the appropriate procedure code and modifiers and indicate the diagnoses for which testing is being performed.  The following CPT codes apply to testing for PAD:  92922 (limited) and 93923 (complete), for upper or lower extremity physiologic studies; 93925 and 93926, for lower extremity duplex studies; and 93930 and 93931, for upper extremity duplex studies.  Unlike the examples provided in paragraph 40, there is no statutory authority for coverage of PAD screening.  As explained above, providers and MA organizations can only submit CPT codes for reimbursement if they are based on services that are necessary with documented patient conditions.

**D.     Volume Plethysmography ABI vs. Photo Plethysmography**

44.     There are two traditional diagnostic tools for detecting PAD: ultrasound studies ("ultrasound duplex scans"), and Ankle Brachial Index ("ABI") measurement.  Both the technical and professional components of conducting an ultrasound duplex scan require specialized training, and therefore are not universally available, especially in primary care settings.  ABI measurements are

1 || taken using blood pressure cuffs attached to the limbs. Traditionally, the blood pressure readings are
2 || taken using a handheld Doppler instrument—a manual, labor intensive process that can be subject to
3 || human error. Specifically, the Doppler instrument is placed on the skin adjacent to the blood
4 || pressure cuff. As the cuff is inflated, the Doppler signal disappears; as the cuff is then deflated, the
5 || signal re-appears. The pressure of the cuff when the signal re-appears is the systolic pressure for that
6 || limb. The process is repeated for each arm and leg.

7 ||      45.     Over the past 15 years, several companies have developed automated ABI devices that
8 || do not require the use of the handheld Doppler instrument, reducing human error and labor time.
9 || Those devices typically include four blood pressure cuffs, along with pressure sensors
10 || (pneumoplethysmographs) that detect blood flow—and replace the handheld Doppler. Those cuffs
11 || and sensors are connected to a computer that calculates ABI. This method is referred to as ABI with
12 || "pulse volume recordings (PVR)."

13 ||      46.     Photoelectric plethysmography, in contrast, uses a light-emitting diode (LED) in a
14 || finger clip to measure the amount of light transmitted or reflected, which can vary depending on the
15 || volume of blood present—thereby tracking each cardiac cycle.

16 ||      47.     Photoelectric plethysmography is not approved by CMS for detection of PAD, and
17 || thus, is not covered for reimbursement by Medicare. The pertinent National Coverage Determination
18 || clearly states: "Category II – *Experimental:* The following methods have not yet reached a level of
19 || development such as to allow their routine use in the evaluation of suspected peripheral vascular
20 || disease. . . Photoelectric Plethysmography - This method is considered useful only in determining
21 || whether or not a pulse is present and does not provide reproducible measurements of blood flow."
22 || (*See* Exhibit 3, National Coverage Determination (NCD) for Plethysmography, Section 20.14
23 || (emphasis added); *see also* Exhibits 1 and 2, United HealthCare Advantage Policy Guideline.)
24 || Medicare does not cover any investigational or experimental services. *See* Title XVIII of the Social
25 || Security Act Section 1862(a)(1)(D).

26 ||      48.     Similarly, Local Coverage Determinations ("LCDs") provide the same. For example,
27 || LCD 35761 clearly states "Non-covered peripheral arterial study testing methods include

28 ||

1  thermography, mechanical oscillometry, inductance or capacitance plethysmography, *photoelectric*

2  *plethysmography*, differential plethysmography, and light reflective rheography."· (emphasis added)

3  ·   49.    Noridian Healthcare Solutions is the Medicare Administrative Contractor for

4  Jurisdiction E, Part A & Part B for California, Hawaii, Nevada, American Samoa, Guam, Northern

5  Mariana Islands, and Jurisdiction F, Part A & B for Alaska, Arizona, Idaho, Montana, North Dakota,

6  Oregon, South Dakota, Utah, Washington and Wyoming.  In Jurisdictions E and F, a LCD entitled

7  Noninvasive Peripheral Arterial Studies defines the indications for peripheral arterial evaluations as

8  "claudication, rest pain, tissue loss defined as gangrene or pre-gangrenous changes, aneurysmal

9  disease, evidence of thromboembolic events, blunt or penetrating trauma, lower extremities surgery

10  where vascular disease is clinical suspected, for patients with chronic renal failure for whom A/V

11  fistula is planned and radial artery evaluations."  The policy defines methods that are not "reasonable

12  and necessary" including "mechanical oscillometry, inductance plethysmography, capacitance

13  plethysmography, photoelectric plethysmography, and thermography." (Emphasis added.)  Further,

14  risk factors such as age, diabetes, hypertension, cardiovascular disease, smoking and others are NOT

15  criteria for coverage. *See* LCD 34219 (Region E) and LCD 24339 (Region F).

16  50.    Even United's own policies reject the use of photoelectric plethysmography.  Exhibits

17  1 and 2 are United Healthcare's reimbursement policies for 2013 and 2020.  They both categorize

18  Semler's photoelectric plethysmography as Experimental: "This method is considered useful only in

19  determining whether or not a pulse is present and **does not provide reproducible measurements of**

20  **blood flow."** (emphasis added)

21  **E.    Defendants Engaged in a Scheme to Increase the Percentage of MA Patients**

22  **Diagnosed with PAD**

23  **1.    United concluded that MA pays significantly more for patients diagnosed**

24  **with PAD—a lifelong condition**

25  51.    As described above, for MA plans the ICD-9 codes are mapped to HCCs, which are

26  then assigned a RAF score.  RAF scores are then multiplied by the monthly bid amount to determine

27  the total reimbursement for MA enrollees.

28

1   52.   The following diagram illustrates how the total reimbursement is determined through

2   application of the RAF to the bid:



*See* article, http://medpac.gov/docs/default-source/payment-basics/medpac_payment_basics_16_ma_final.pdf?sfvrsn=0 (revised Oct. 2016).

21   53.   In 2012, United conducted a study for the purpose of quantifying the increase in

22   reimbursement associated with PAD diagnoses. (*See* Exhibit 4, Optum 2012 Study Report.) The

23   study noted that a PAD diagnosis is mapped to one of the two HCCs: with and without

24   complications.[2]  These HCCs increase the RAF scores significantly. (*See id.*)

25   54.   The 2012 study concluded that in 2013, the estimated average monthly bid of a MA

26   enrollee would be $775. The study concluded that PAD diagnosis could result in additional

27

28   [2] One PAD-related ICD-9 code, for "unspecified atherosclerosis," does not fall within an HCC and therefore does not impact RAF scores and reimbursement.

1 reimbursement of *$100 to $430* per month depending on the severity of PAD, and whether the

2 Medicare enrollee was categorized as a community enrollee or institutional enrollee. The highest

3 increase in reimbursement would occur within the community designees diagnosed with PAD

4 "without complications." (*See id.*) The following table illustrates these incremental PAD

5 reimbursements:

| | Community MA Enrollee, without Complications | Institutional MA Enrollee, with Complications | Community MA Enrollee, with complications | Institutional MA Enrollee, without Complications |
|---|---|---|---|---|
| RAF Score Increase | .555 | .439 | .282 | .129 |
| **Increased Monthly Reimbursement** | **$430** | **$340** | **$219** | **$100** |

12 United thus knew that identifying enrollees with PAD—especially those without acute symptoms or

13 complications—would be extremely lucrative.

> **2.** **The QuantaFlo machine provided the perfect opportunity for United to**
>
> **capitalize on the PAD diagnosis premium.**
>
> **a.** **Pre-2015, Semler's device was approved by the FDA only for**
>
> **extremity pulse detection, not PAD diagnosis.**

18   55. The predecessor to the QuantaFlo was a machine called "FloChec." FloChec was

19 approved in 2010 by the FDA, but only for extremity pulse detection, not diagnosing arterial disease.

20 Semler's FDA filing clearly stated: "Indications for use would be unexplained pain or claudication

21 discomfort in the extremity, based on the history and physical findings performed by a licensed

22 physician. The device may be used to detect relative blood flow changes before, during and after

23 applied pressure to the brachial, femoral, radial, and ulnar arteries. The FloChec Device *is not for*

24 *diagnosis nor is it indicated for the treatment, prevention, cure or mitigation of disease*." (*See*

25 Exhibit 5, December 21, 2009 letter from Semler for approval of device providing 510(k) summary.)

26 (emphasis added)

27   56. The FloChec 510(k) clearly stated that the device "is not intended to diagnose

28 disease." Further, in contemporaneous SEC filings, Semler stated: "Currently, FloChec is not

**COMPLAINT**                                  14

1  formally approved for any particular reimbursement code." (Exhibit 6, November 15, 2013 Semler
2  Scientific, Inc. SEC filing at p. 13)

3      57.    Most importantly, FloChec was presented to the FDA and marketed as a "photo"
4  plethsmography device. Photo, otherwise known as photoelectric, plethysmography, uses infrared
5  light sensors. As detailed herein, Medicare and all other major payors consider photoelectric
6  plethysmography to be experimental, and non-reimbursable.

7          **b.**    **Semler re-branded its device as "QuantaFlo," and fraudulently**
8                  **obtained FDA approval for use in diagnosis of PAD.**

9      58.    Due to the limited utility of FloChec, and limited options for reimbursement, in 2015,
10  Semler updated the FloChec software, and rebranded it as "QuantaFlo." Its software changes and
11  rebranding, however, did nothing to alter the underlying technology: QuantaFlo was still a photo
12  plethysmograph. Indeed, the similarity of the FloChec and QuantaFlo technology is apparent in
13  Semler's marketing materials:



28



*QuantaFlo™ System*

59.     As a photoelectric plethysmograph, however, QuantaFlo would still have limited use, and limited sales. Accordingly, Semler concocted a scheme to vastly increase sales: It defrauded the FDA into approving QuantaFlo as a "volume" plethysmograph, indicated for use in diagnosing PAD.

60.     Specifically, in 2015, Semler submitted a 510k application for QuantaFlo to the FDA, listing FloChec as the predicate device. As described in the prior section, FloChec was admittedly a "photo plethysmograph," and presented to the FDA as such. In the subsequent QuantaFlo 510k application, however, Semler misled the FDA by stating that QuantaFlo "uses the same technology as the predicate device," but characterizing that "same technology" as "Volume Plethysmography." (Exhibit 7.) This was not a typographical error; Semler repeated the false description several times in its application to the FDA:

       a.  "QuantaFlo aids clinicians in the diagnosis of vascular disease by measuring blood volume changes **using volume plethysmography** in the Brachial, Posterior Tibial, and Anterior Tibial/Dorsal Pedis arterial distributions."

       b.  "The application calculates the result via a proprietary algorithm, which is based on the features of **the volume plethysmography signals** from the Brachial, Anterior Tibial / Dorsalis Pedis, and Posterior Tibial arterial distributions."

61.    In fact, as with FloChec, QuantaFlo uses <u>photoelectric</u> plethysmography and does not perform volume plethysmography. Again, this is an important distinction, because photoelectric plethysmography is an experimental technology not accurate enough for use in diagnosis of PAD.

62.    By falsely characterizing QuantaFlo as a volume plethysmograph, Semler was also able to obtain the FDA's approval for QuantaFlo's use "in the diagnosis and monitoring of Peripheral Arterial Disease." (Exhibit 7 at pages 1-2.) With this indication for use in-hand, Semler unleashed its Medicare Advantage marketing scheme, and gained quick traction with United.

        **c.    United contracted with Semler to use Semler's sham PAD screening test, and gave providers the machines to use on MA patients.**

63.    Semler began pushing QuantaFlo on large insurance plans. It marketed the device as delivering fast, accurate results, at the point of care. Semler further marketed QuantaFlo as easy to use, portable and with software that can be installed on any Windows based PC, laptop or tablet. But most importantly, Semler marketed QuantaFlo as an easy way to increase Medicare's payments by identifying latent PAD.[3] As confirmed by a former sales representative in Texas, Semler markets to United and other MA Organizations using a specific message that if the providers identify PAD, increasing the RAF scores, Medicare payments will increase approximately 30%.

64.    The Semler equipment is leased to United for a flat fee. Then United, at no charge, provides the QuantaFlo device to physicians, and pays physicians to use the machine on all MA patients. If United believes that a physician is not identifying enough patients with PAD, United leans on the physician to diagnose more. In addition, physician payments from United increase if their population has increased risk factors. Hence, physicians also benefit financially by ordering more testing and increasing RAF scores.

///

///

///

---

[3] United is the largest MA Organization to use Semler, but not the only.

**COMPLAINT**

LAW OFFICES
COTCHETT, PITRE &
McCARTHY, LLP

1

        **d.**    **The sham screening test results in 30% of patients being diagnosed**

2

                 **with PAD, where in reality only 9-14% have PAD**

3        65.    United recommends to providers that all patients be tested with QuantaFlo, and

4  provides various inducements and pressures to encourage physicians to do so. Semler has a digital

5  program that captures QuantaFlo ordering by physician and provides this information to United. The

6  insurance companies pay the physicians at least $40 - $60 per Medicare Advantage patient—

7  sometimes as much as $195 per patient—to conduct testing for PAD with QuantaFlo.

8        66.    This scheme results in approximately 30% of the United MA enrollees being

9  diagnosed with PAD. However, this percentage is at odds with the national average. According to

10  Optum's own data, only 12-20% of the entire 60+ population in the United States have PAD. (*See*

11  Exhibit 8, Optum Insider, September 2018.)

12       67.    These faulty diagnoses, in turn, result in false RAF scores and inflated Medicare

13  Advantage payments.

14       68.    As described above, each beneficiary's risk score is calculated anew for each payment

15  year. United submits the risk assessment data, including the improper PAD screening diagnoses, to

16  CMS using CMS's Risk Adjustment Processing System. These submissions include the

17  beneficiary's identification number, the date of the medical encounter, the type of provider, and the

18  diagnosis code reported by the provider for the encounter. The final deadline for the data

19  submissions to CMS is generally four to six weeks after the end of the payment year at issue. For

20  example, for the 2012 payment year, United could submit diagnosis codes relating to year 2011

21  medical encounters until approximately February of 2013.

22       69.    Because final submission deadlines are after the completion of the payment year,

23  monthly payments that are made during the payment year are interim payments. After the final

24  submission deadline CMS determines if any adjustments to the interim monthly payments are

25  necessary based on all diagnoses submitted for each beneficiary up until the final submission

26  deadline and re-calculates each RAF score for the payment year to determine if it has changed and

27  whether a plus or minus adjustment is necessary for a beneficiary.

28

**COMPLAINT**                                                  

70.  Although United is required to maintain a robust compliance program in order to obtain payments under Medicare Parts C and D, it knowingly submitted PAD diagnoses based on fraudulent and inaccurate screenings. United, as the MA Organization, must ensure the validity of the diagnoses it submits. Among other things, United is responsible for deleting any data submissions if the diagnoses are invalid, even if payment was already made. In fact, United "maintains ultimate responsibility for adhering to and otherwise fully complying with all terms and conditions of its contract with CMS." 42 C.F.R. § 422.504(i)(1).

71.  United's motivation to push the use of QuantaFlo was to increase RAF scores, market share, and revenue with increased PAD diagnoses. It is no coincidence that United's revenue in recent years has skyrocketed. United Health Group's revenues in 2018 totaled approximately $226 billion. (See https://www.businesswire.com/news/home/20190115005285/en/UnitedHealth-Group-Reports-2018-Results-Highlighted-by-Continued-Strong-and-Diversified-Growth.) Optum, responsible for submitting risk adjustment data for United, has focused on creating its own provider network and now has 47,000 physicians nationally in this network. To put this into perspective, Kaiser is a distant second with less than 30,000 physicians.

72.  As one article notes, "Optum is a behemoth in the healthcare industry, reaping profits for parent company UnitedHealth Group by having virtually every payor and over 5,000 hospitals in its portfolio. Optum works with about 300 health plans, including the insurance arm of UnitedHealth Group, UnitedHealthcare." (*See* Exhibit 9.) Indeed, "Because it is a separate business from UnitedHealth Group and UnitedHealthcare, Optum is not under the same restrictive regulations faced by insurers. This means it can have a higher profit margin than the 15 to 20 percent that's regulated. Insurers are mandated to spend 80 to 85 percent on medical costs. If they make more than that, they must give the profits back to members. Optum is not an insurance company so it doesn't have to adhere." (Exhibit 9)

73.  As Optum has acquired local healthcare organizations, it has further expanded the QuataFlo scheme. For example, one employee of Healthcare Partners of Nevada, a large health care system, stated that DaVita management, after it was acquired by Optum, asked her to switch from the Padchek device to QuantaFlo.

74.    QuantaFlo is in use merely for the MA organizations, such as United, to increase RAF scores, and thus, increase revenue.  This profit-inflation purpose is highlighted by Semler's 510-K which states: "Developing additional product and service offerings that allow healthcare providers to deliver cost- effective wellness *and receive increased compensation for their services*." (Exhibit 10, page 4, emphasis added).  The company's only device is the QuantaFlo.

### e.    QuantaFlo is unreliable technology.

75.    As described above in section IV, D, photoelectric plethysmography is not a reliable technology, and not appropriate for use in diagnosing PAD.  QuantaFlo is no different.  There is no peer reviewed study confirming that QuantaFlo's photoelectric plethysmography data can be accurately converted into an ABI.  In fact, in the *only* peer reviewed study, the QuantaFlo showed a worthless positive predictive value of only 14% for moderate and mild cases, and a meager 67% for severe cases.  This study was performed under the auspices of a full Institutional Review Board.  The lead author of the study, Keith Pereira, MD, was so disappointed in QuantaFlo's performance that he stopped using the machine altogether.  Moreover, he stated in an e-mail to one of Relator's members that he "was very disappointed [in] the performance of [QuantaFlo].  It was neither sensitive nor specific for PAD."

76.    Based on concerns in the medical community with the usefulness of QuantaFlo, Semler attempted to generate a study that could be used by Semler sales representatives, and to mollify clients complaining about inaccurate results.  Semler gave a large Texas-based clinic, National Interventional Radiology Partners (NIRP), a free device in exchange for NIRP allowing Semler access to patient records for the purpose of creating a retroactive study.  Semler manipulated the study by cherry-picking the patients and failed to inform patients that NIRP would be sharing their data.

77.    At least one of Semler's sales representative resigned because of so many physician complaints about the inaccuracy of QuantaFlo.

### F.    Defendants submitted False Claims.

78.    The FCA defines the term "claim" to mean "any request or demand, whether under a contract or otherwise, for money or property and whether or not the United States has title to the

LAW OFFICES
COTCHETT, PITRE &
McCARTHY, LLP

1  money or property, that (i) is presented to an officer, employee, or agent of the United States; or (ii)

2  is made to a contractor, grantee, or other recipient, if the money or property is to be drawn down or

3  used on the Government's behalf or to advance a Government program or interest, and if the United

4  States Government (i) provides or has provided any portion of the money or property requested or

5  demanded; or (ii) will reimburse such contractor, grantee, or other recipient for any portion of the

6  money or property which is requested or demanded." 31 U.S.C. § 3729(b)(2)(A) (2009).

7      79.     As amended by FERA, the FCA also makes a person liable to the United States

8  government for three times the amount of damages which the government sustains because of the act

9  of that person, plus a civil penalty, for each instance in which the person "knowingly makes, uses, or

10  causes to be made or used, a false record or statement material to a false or fraudulent claim." 31

11  U.S.C. § 3729(a)(1)(B) (2009).

12      80.     The FCA defines the terms "knowing" and "knowingly" to mean that a person, with

13  respect to information: (1) "has actual knowledge of the information"; (2) "acts in deliberate

14  ignorance of the truth or falsity of the information"; or (3) "acts in reckless disregard of the truth or

15  falsity of the information." 31 U.S.C. § 3729(b)(1)(A) (2009). The FCA further provides that "no

16  proof of specific intent to defraud" is required. 31 U.S.C. § 3729(b) (2006); 31 U.S.C. §

17  3729(b)(1)(B) (2009).

18      81.     The Federal Anti-Kickback statute, 42 U.S.C. § 1320a-7b(b)(2)(A), prohibits "Illegal

19  remunerations" for "[w]hoever knowingly and willfully offers or pays any remuneration (including

20  any kickback, bribe, or rebate) directly or indirectly, overtly or covertly, in cash or in kind to any

21  person to induce such person to refer an individual to a person for the furnishing or arranging for the

22  furnishing of any item or service for which payment may be made in whole or in part under a Federal

23  health care program . . . ." 42 U.S.C. § 1320a-7b(b)(2)(A). The statute was amended to provide that

24  any claim to a United States government program incident to a kickback or bribe amounts to a false

25  claim under the False Claims Act. 42 U.S.C. § 1320g. Accordingly, a kickback is a false claim for

26  purposes of the FCA.

27      82.     The FCA further provides that anyone who conspires to commit a violation of

28  subparagraph (A), (B), (D), (E), (F), or (G) of Section 3729 is also liable. 31 U.S.C. § 3729(a)(1)(C).

1  **V.    CAUSES OF ACTION**

2  **FIRST CAUSE OF ACTION**
**ON BEHALF OF THE UNITED STATES**
3  **VIOLATIONS OF THE FEDERAL FALSE CLAIMS ACT**
**PRESENTING FALSE CLAIMS, AGAINST ALL DEFENDANTS**
4  **(31 U.S.C. § 3729(a)(1)(A))**

5       83.    Relator incorporates herein by reference and realleges the allegations stated in this

6  Complaint.

7       84.    Defendants, as Medicare Advantage Organizations providing Medicare Part C

8  coverage, knowingly caused to be presented false claims for payment or approval to an officer or

9  employee of the United States.

10      85.    Defendants knowingly (as defined in 31 U.S.C. § 3729(b)(1)) presented false records

11  and statements, including but not limited to risk adjustment data, risk adjustment attestations, claims,

12  bills, invoices, requests for reimbursement, and records of services, in order to obtain payment for

13  claims premised upon illegal kickbacks to providers, including physicians and their staff.

14      86.    Defendants knowingly presented risk adjustment data based on inaccurate,

15  experimental, and unnecessary testing for the purpose of increasing risk adjustment factor scores

16  (RAF) in order to obtain Medicare reimbursement at a much higher rate.

17      87.    Defendants knowingly presented risk adjustment data based on inaccurate diagnoses

18  of beneficiaries for the purpose of increasing the RAF scores to obtain Medicare reimbursement at a

19  much higher rate.

20      88.    Defendants knowingly made, used, and caused to be made and used false certifications

21  that their claims, and all documents and data upon which those claims were based, were accurate, and

22  were supplied in full compliance with all applicable statutes and regulations.

23      89.    The conduct of Defendants violated 31 U.S.C. § 3729(a)(1)(A) and was a substantial

24  factor in causing the United States to sustain damages in an amount according to proof.

25

26  ///

27  ///

28  ///

LAW OFFICES
COTCHETT, PITRE &
McCARTHY, LLP

**COMPLAINT**                                                                                          22

1

**SECOND CAUSE OF ACTION**
**ON BEHALF OF THE UNITED STATES**

2

**VIOLATIONS OF THE FEDERAL FALSE CLAIMS ACT**
**MAKING OR USING FALSE RECORDS OR STATEMENTS**

3

**MATERIAL TO PAYMENT OR APPROVAL OF FALSE CLAIMS,**
**AGAINST ALL DEFENDANTS**

4

**(31 U.S.C. § 3729(a)(1)(B))**

5        90.    Relator incorporates herein by reference and realleges the allegations stated in this

6    Complaint.

7        91.    Defendants knowingly (as defined in 31 U.S.C. § 3729(b)(1)) made, used, or caused to

8    be made or used false records or statements material to false or fraudulent claims.

9        92.    Defendants knowingly made, used, and/or caused to be made and used false records

10   and statements, including but not limited to risk adjustment data, risk adjustment attestations, claims,

11   bills, invoices, requests for reimbursement, and records of services, in order to obtain payment or

12   approval of charges by the Medicare program.  Among other things, Defendants knowingly submitted

13   false claims for Medicare through the Medicare Advantage Program.

14       93.    The conduct of Defendants violated 31 U.S.C. § 3729(a)(1)(B) and was a substantial

15   factor in causing the United States to sustain damages in an amount according to proof.

16

**THIRD CAUSE OF ACTION**
**ON BEHALF OF THE UNITED STATES**

17

**VIOLATIONS OF THE FEDERAL FALSE CLAIMS ACT**
**CONSPIRACY, AGAINST ALL DEFENDANTS**

18

**(31 U.S.C. § 3729(a)(1)(C))**

19       94.    Relator incorporates herein by reference and realleges the allegations stated in this

20   Complaint.

21       95.    Defendant Semler Scientific, Inc. knowingly conspired to violate 31 U.S.C. Sections

22   3729(a)(1)(A), (a)(1)(B), and (a)(1)(C) with United Defendants.

23       96.    Defendant Semler Scientific, Inc. as the manufacturer of QuantaFlo conspired with

24   United to design a scheme to increase sales and revenue by submitting false claims through false risk

25   adjustment data and inflated RAF scores.

26       97.    Defendant conspired with United Defendants to provide kick-backs to providers,

27   provide the device to United Defendants at a lower rate, and fraudulently increase sales of QuantaFlo

28   by falsely marketing the accuracy, FDA approval, and diagnoses associated with the product.

1    98.    Defendant conspired with United Defendants in knowingly (as defined in 31 U.S.C. §

2    3729(b)(1)) presenting false records and statements, including but not limited to risk adjustment data,

3    risk adjustment attestations, claims, bills, invoices, requests for reimbursement, and records of

4    services, based on false marketing, unnecessary testing, and inaccurate use of the QuantaFlo device.

5    99.    Defendant conspired with United Defendants to knowingly present risk adjustment

6    data based on inaccurate, experimental, and unnecessary testing for the purpose of increasing

7    Defendant United's RAF scores and increasing Defendant Semler Scientific, Inc.'s sales through

8    United.

9    100.    Defendants knowingly conspired with United Defendants to make, use, and caused to

10    be made and used false certifications that claims, and all documents and data upon which those

11    claims were based, were accurate, and were supplied in full compliance with all applicable statutes

12    and regulations.

13    101.    The conduct of Defendant violated 31 U.S.C. § 3729(a)(1)(C) and was a substantial

14    factor in causing the United States to sustain damages in an amount according to proof.

15    **FOURTH CAUSE OF ACTION**
**ON BEHALF OF THE UNITED STATES**
16    **VIOLATIONS OF THE FEDERAL FALSE CLAIMS ACT**
**REVERSE FALSE CLAIMS, AGAINST ALL DEFENDANTS**
17    **(31 U.S.C. 3729(a)(1)(G))**

18    102.    Relator incorporates herein by reference and realleges the allegations stated in this

19    Complaint.

20    103.    In the alternative, Defendants knowingly made, used, or caused to be made or used a

21    false record or statement material to an obligation to pay or transmit money property to the United

22    States, or knowingly concealed or knowingly improperly avoided or decreased an obligation to pay or

23    transmit money or property to the United States.

24    104.    Defendants received far more money from the Medicare programs than they were

25    entitled due to Defendants knowing submission of false risk adjustment data.  Defendants knew that

26    they had received more money than they were entitled to, and avoided their obligation to return the

27    excess money to the United States.

28

1    105.   The conduct of Defendants violated 31 U.S.C. § 3729(a)(1)(G) and was a substantial

2  factor in causing the United States to sustain damages in an amount according to proof.

3  **VI.    PRAYER FOR RELIEF**

4    WHEREFORE, Plaintiff the United States of America, by and through Relator, prays for

5  relief against Defendants as follows:

6  **Pursuant to the False Claims Act:**

7  **TO THE UNITED STATES OF AMERICA AND QUI TAM PLAINTIFF:**

8    1.    For civil penalties of up to the maximum statutory amount permitted to be imposed for

9        each and every false and fraudulent claim for payment submitted, presented, or caused

10        to be submitted to Medicare for payment;

11    2.    For treble damages resulting to the Medicare system from the conduct of Defendants;

12    3.    For pre- and post-judgment interest;

13    4.    For reasonable attorneys' fees, costs, and expenses incurred in bringing this case; and

14    5.    That Qui Tam Plaintiff be awarded the maximum percentage of recovery allowed

15        pursuant to the False Claims Act.

16

17  **VII.    JURY DEMAND**

18    Plaintiff demands a jury trial on all issues so triable.

19  Dated: July 15, 2021                    **COTCHETT, PITRE & McCARTHY, LLP**

20

21                    By:

22                        JUSTIN T. BERGER
                        SARVENAZ "NAZY" J. FAHIMI

23                    *Attorneys for Relator*

24

25

26

27

28